WILLIAM A. BROOKS, APPELLANT, V. HUGH MACLEAN ET
AL., APPELLEES.

FILED JANUARY 7, 1914. No. 17,289.

1. **Counties: COUNTY BOARDS: SPECIAL MEETING.** The failure of a county clerk to make a record of a call for a special meeting of the county board does not invalidate such call, where it was in fact made and due notice given; the record of the county board showing a meeting pursuant thereto.

2. ———: ———: SPECIAL ELECTION: VALIDITY OF CALL. Two members of a county board composed of three members may call a special election to vote on a proposition to issue bonds, though the other member signed a petition for the election.

3. ———: ———: ———: PETITION: RESIDENCE OF PETITIONERS. The statute, requiring that "a petition signed by not less than fifty freeholders" of the precinct shall be presented to the county board for the purpose of calling an election to vote bonds, does not mean that the petitioners shall be residents of such precinct. Comp. St. 1911, ch. 45, sec. 14.

4. **Pleading: CONSTRUCTION: PUBLIC INTERESTS.** In a matter of public concern, the court will be liberal in its construction of pleadings in the interest of the proper conduct of public business and for the protection of the taxpayer, and the same rule will be applied with reference to briefs and arguments.

5. **Counties: PRECINCT BONDS: VALIDITY: INJUNCTION.** A proposition to vote bonds to aid a corporation in the construction of a bridge was submitted to the voters of Riverside precinct in Dawson county. In the petition to call the election no donee of the bonds was named. No proposition was on file with the county board to build the bridge either at the time of the call of the election or, so far as the record shows, at any time since. So far as the record shows, the county board inserted in the call on its own volition the name of a proposed donee. In the petition and in the proposition submitted the proposed site of the bridge was so indefinite and uncertain that it might be located at any point for a mile along the bank of the stream. No road, either public or private, was in existence to the banks upon either side or across the stream within the mile limit at the time of the call, or at the time of the election. The proposition was to vote bonds in the sum of $12,800. The capital stock of the proposed donee, the Riverside Bridge Company, was the sum of $250, "to which shall be added any sums which may be voted by any precinct or

municipal corporation to aid in the construction of said bridge." Other provisions of the articles provided that the corporation might sell the bridge "on such terms and to such persons or corporations as shall seem best for the maintenance of said bridge." There is no provision anywhere that the donee shall maintain the bridge. *Held*, That the proposition was unauthorized; that the location of the proposed bridge was too indefinite and uncertain; that the rights of the taxpayers were not sufficiently guarded; and that the issuance of the bonds should be enjoined.

APPEAL from the district court for Dawson county: BRUNO O. HOSTETLER, JUDGE. *Reversed with directions.*

*H. M. Sinclair* and *W. D. Oldham,* for appellant.

*W. A. Stewart, John H. Linderman, John J. Halligan* and *T. M. Hewitt, contra.*

LETTON, J.

This action was brought by the plaintiff, for himself and in behalf of all other taxpayers similarly situated, for the purpose of enjoining the issuance and delivery of certain precinct bonds voted by Riverside precinct of Dawson county to aid in building a bridge across the Platte river. The defendants are the board of county commissioners of Dawson county and the Riverside Bridge Company, the proposed donee of the bonds. The principal reasons given in the petition to show that the bonds were illegal are: (1) Illegality in the formation of the precinct; (2) that the petition for the calling of an election was not signed by 50 freeholders; (3) that the proposed donation was in aid of a private enterprise; that the donee is a private corporation with a capital stock of $250; that there is no road either private or public that leads to or from the proposed bridge, nor is there a road or bridge across the river at that point; that the land along the stream, as well as the bed, belongs to private owners; that the donee has no power to take land by eminent domain; that the bridge, when constructed, would be inaccessible to the public, and the property of

the plaintiff will be taken to pay the bonds without due process of law; (4) that a proposition to levy annually "a tax equal to the entire interest charge on the said bonds and equal to 10 per cent. of the principal of the same for a sinking fund, until all of said bonds are paid," is invalid upon its face.

The answer is substantially a general denial. The district court found generally for the defendants, and dismissed the action. Plaintiff appeals.

The first point argued for a reversal is that the order of the county board organizing Riverside precinct is void for the reason that the petition presented to the county board for that purpose did not contain a majority of the legal voters. In his application for injunction plaintiff sets out a petition containing only 37 names, but the answer denies that this is a correct copy of the petition presented to the county board, and there is testimony that a similar petition containing 51 additional names was also filed with the county board.

Plaintiff insists that the order forming Riverside precinct is void for the further reason that it was made at a special meeting, which the record of the county board recites was called by the county clerk, and that this meeting was illegal because the county clerk had no authority to call it, because there is no record of the calling of the meeting, and because the county board had no authority to create a precinct for the purpose of voting bonds.

The county clerk has authority to call a special session when the interest of the public demands. Comp. St. 1911, ch. 18, art. I, sec. 57. The call was made and the meeting held pursuant thereto. The meeting itself is proved by a proper record, and the presumption is that it was properly called. The failure of the clerk to make a record of the call did not invalidate it. *Green & Van Duyn v. Lancaster County,* 61 Neb. 473, 483.

The statute provides that each board of county commissioners shall divide the county into convenient precincts, and, as the occasion may require, erect new ones, subdivide the precincts, or establish better precinct lines.

Comp. St., ch. 18, art. I, sec. 60. This is sufficient to confer the authority upon the county board. The facts with respect to the creation of this precinct are not parallel to those involved in the case of *Morton v. Carlin,* 51 Neb. 202; hence, it furnishes no authority against the validity of the organization of the precinct.

The point argued that the board was not legally constituted, since it was composed of three members, one of whom signed the petition, is not well taken. The joint action of two qualified members of the board was sufficient. *State v. Piper,* 17 Neb. 614. We conclude, therefore, that the attack upon the organization of the precinct made in the petition has not been sustained.

Coming now to the validity of the election: The discussion of this subject assumes several phases. In the first place it is contended that the petition for the election did not contain the names of 50 freeholders, as required by the statute. Sixty names are affixed thereto. It is claimed that four of the signers of the petition were made freeholders for the purpose of signing the petition; but we are satisfied that the finding of the district court to the contrary is sustained by the evidence. It was also contended that a number of nonresident owners of land in the precinct signed the petition, and that if such names are deducted there would not be the names of a sufficient number of resident freeholders signed to the petition to authorize the calling of an election. The right to petition the county board to call an election to vote on a proposition to issue precinct bonds does not depend upon the elective franchise. The statute does not say that the petitioners shall be "resident freeholders" or electors. The requirement is that a "petition signed by not less than fifty freeholders of the precinct" shall be presented to the county commissioners. Comp. St. 1911, ch. 45, sec. 14. To show that the word "freeholders" means "resident freeholders" plaintiff cites *State v. Babcock,* 21 Neb. 187; *Wullenwaber v. Dunigan,* 30 Neb. 877; *Morton v. Carlin,* 51 Neb. 202. In the first of those cases the term "resident freeholders" is neither used in the

statute construed, nor in the opinion of the court. In the second case it was distinctly stated that the question relating to "freeholders" was not necessary to a decision. The words "resident freeholders" do not appear in the opinion, nor in the statute construed, and evidently crept into the syllabus through inadvertence. In the third case cited, this syllabus inadvertently containing the word "resident," is copied in the opinion. Petitioners for a license to sell intoxicating liquors must be "resident freeholders." Comp. St. 1911, ch. 50, sec. 1. There is no provision of statute, however, requiring petitioners for an election to vote bonds to be "resident freeholders." The terms "freeholders" and "resident freeholders" in the different statutes are not synonymous, and cannot be so construed. Nonresident and alien freeholders of the precinct may petition the county board to call an election to vote bonds. *Rix v. Johnson,* 5 N. H. 520; *Matthews v. People,* 159 Ill. 399. In this view of the law the petition assailed is sufficient.

The objections that the bonds were not voted and will not be delivered for a public purpose are more serious. The pleading of the specific defects in the proceedings and as to the character of the donee is by no means a model in form, but the court in a matter of public concern will be liberal in its construction of pleadings in the interest of the proper conduct of public business and the protection of the taxpayer.

The same rule will be applied with reference to the briefs and arguments; and, as section 675c of the code provides, the court may consider a plain error not assigned.

The petition to the county commissioners to call the election specified "that the work for which bonds are desired to aid is the construction and operation of a wagon bridge across the Platte river in said county, extending from section 5 on the north bank to section 8 on the south bank, both in town. 10 north, of range 24 west of the 6th P. M." It failed to set forth whether the bridge was to be built by the county, by the precinct, or

by a private corporation, whether it should be a free bridge upon a public highway, or whether it should be a toll bridge owned by a private corporation. At the special election the board submitted the questions whether bonds should be issued and a tax levied "to aid in the construction and completing of a wagon bridge across the Platte river, extending from section 5 on the north bank of said river to section 8 on the south bank of said river," etc., and, also, "shall said bonds be delivered to the Riverside Bridge Company, a corporation, upon giving sufficient security, to aid in the construction of said bridge, upon the execution thereof by the board of county commissioners of Dawson county, Nebraska, * * * and shall said bonds be delivered to the said bridge company on its giving bond, to be approved by the board of county commissioners, to apply the proceeds thereof to the construction of said bridge." There is no condition in the bonds, or in the proposition to vote bonds, requiring the bridge to be maintained by the corporation. There is no provision that the bridge shall be a public one, whether toll or free. A proposition to vote bonds is in the nature of a contract which, when accepted, is binding with respect to the parties. *Wullenwaber v. Dunigan, supra; Nash v. Baker*, 37 Neb. 713. No proposition had been filed with the county board by the Riverside Bridge Company at the time the election was called, and no such proposition is shown to have been on file when the election was held, or has since been put on file.

Section 3 of the articles of incorporation of the Riverside Bridge Company is as follows: "That the capital stock of said company shall be the sum of $250 to which shall be added any sums which may be voted by any precinct or municipal corporation to aid in the construction of said bridge; that the capital necessary to construct said bridge is $12,800." Another section provides: "The business to be transacted by said corporation shall be the construction and operating of a wagon bridge across the Platte river at a point between sections 5 and 8; * * * that the company * * * may

purchase or otherwise acquire real estate for roads and approaches to the said bridge, may borrow money and issue bonds, may, if necessary, collect tolls for the use thereof, may purchase and sell materials necessary for the construction thereof, and may after the construction of the same, when deemed best, sell, convey, and transfer the said bridge with all appurtenances on such terms and to such persons or corporations as shall seem best for the maintenance of the said bridge."

No county road had been established to any definite point on the river bank between sections 5 and 8, nor any road running across the river. The bridge corporation may, so far as anything in the proposition goes, build at any point within the limit of one mile along the river bank. When a taxpayer is called upon to vote upon the granting of public money in aid of the building of a bridge, the locality of the bridge should be definitely fixed, or should be fixed at least within a much narrower latitude than one mile.

We are also of the opinion that the county commissioners have no authority upon their own initiative and without any proposition ever having been made and filed by any one, to insert in a proposition to be voted upon the name of any particular person or corporation.

To sum up: The condition of the record in these respects is that, without any tender or offer to build a bridge having been made to the county board, that body, acting by two of its members, the third member being disqualified by reason of being an active petitioner, submitted a proposition to the voters to issue bonds in the sum of $12,800 to a corporation with a capital stock of $250, which was organized to build a bridge. The location of the bridge was not fixed within a mile. One person might vote for the bonds with the idea that the bridge would be located at one point on the river bank, another might vote for it under the impression that it was to be located nearly a mile away. If there had been a road located and established to and across the river at a definite point before the election, it is possible that this objection

might have been overlooked; but, when it is sought to levy a tax for the purpose of making a donation, each voter is entitled to know definitely just how and where the money is to be expended, and to have definite and specific information before he is called upon to vote. If this is not furnished, and the proposition is indefinite and uncertain, if a majority vote for the proposed issue, a taxpayer may stand upon his legal rights and call upon the courts to aid him in restraining the illegal issue.

While it is not the province of the courts to act as the voluntary guardians of taxpayers, where they are called upon for relief it is their duty to furnish it. It is probably true that a majority of the people of Riverside precinct earnestly desire a bridge to be built over the Platte river, and that the purpose is entirely proper and commendable; but, before being compelled to pay taxes to help a private corporation build, each taxpayer should have a clear idea as to where the bridge is to be built, and whether upon the public highway or otherwise. It would be better to have the proposition designate whether the bridge is intended to be a toll bridge or a free one, although the supreme court of the United States has held that this is not absolutely essential to the validity of the bonds. This court in the past has, for the protection of the taxpayer, consistently and repeatedly stood upon and required the letter of the law in such proceedings to be strictly complied with. While everything in the matter has in all probability been done in the utmost good faith, we cannot uphold the laxity of the methods pursued. *George v. Cleveland,* 53 Neb. 716; *Nash v. Baker, supra.*

Holding these views, we find it unnecessary to consider the other points presented. The judgment of the district court is therefore reversed and the cause remanded, with directions to render a decree as prayed in the plaintiff's petition.

REVERSED.

HAMER, J., concurring in part, and in the conclusion.

I do not like to burden the taxpayer with a liability which starts in an irregular way. The formation of the precinct was in pursuance apparently of an agreed plan to vote the bonds on the territory. There is nothing in the construction of a bridge which requires undue haste and irregular methods; and, while there was probably no intent to defraud, the method of forming the precinct was not for the general purposes of government, but to cause the bonds to be issued, which is only *one* purpose and therefore not in accordance with the general purposes of the law. The law calls for the creation of a precinct so that it may exercise all the legitimate functions of government for which a precinct is created. The petition to form the precinct was sworn to by William Ralston before the county clerk on the 1st day of December, 1910. It contemplated the formation of a precinct "to be called Riverside precinct." Up to that time there had been no such precinct. On that same day, December 1, 1910, the board of county commissioners of Dawson county met to create this particular proposed precinct. On that day the board granted the petition as petitioned, and the new precinct was constituted to include the sections described in the petition; said precinct to be known as "Riverside precinct, Dawson County, Nebraska." The board then adjourned to meet December 15, 1910. At this meeting on December 15, 1910, the board considered the matter of voting the bonds in question. It found that the petition was signed "by more than 50 resident freeholders of said Riverside precinct." It provided for the submission of a proposition to vote the bonds at an election to be held in February, 1911. The proposition proposed to be submitted was for the delivery of $12,800 in bonds to a bridge company with a capital of $250.

The first question to be considered is the organization of the precinct.

(a) Was it legal to organize it for the express purpose of voting bonds to build a bridge? A precinct is

not a municipality, and the creation of a precinct ought only to be contemplated for the legitimate purposes for which it may exist. It can only act through and by means of the board of county commissioners or supervisors who are trustees on behalf of the *people* who live in the precinct. A precinct is not a legal entity having the power to act. It does not act on its own account. The thing done was done by the board of county commissioners, and the men who prepared and presented the petition to them must have known at the commencement that there was no municipality asking for the creation of these bonds. A precinct is a mere territorial division. *State v. Dodge County,* 10 Neb. 20.

(b) The meeting was called November 18, 1910, by the deputy county clerk. He had not been ordered to call it by the board or by his principal, the county clerk. I do not understand that he had the power to substitute himself for his principal, or of substituting himself for the board of county commissioners. He was only their clerk. According to the testimony of the county clerk there was no order from the board to call the meeting. I am not satisfied that the board had any jurisdiction to act under the circumstances.

(c) There is another reason why it would seem that there was no jurisdiction to proceed. There was nothing before the board; that is, there was nothing in the office in the shape of a petition to the board *at the time it is claimed that this deputy county clerk acted.* And how could he act unless there was a petition, even though it be admitted that he might otherwise have the right to act. Under the statement made, with nothing in the office, with nothing pending, he makes the order. It is analogous, seemingly, to the issuance of a summons by the clerk of the district court when no petition has been filed.

(d) The county board changed the lines of the precinct for the special purpose of enabling the voters who would thereafter be in the precinct to carry the bridge bonds. They gerrymandered the territory. Section 7, ch. 35, Gen. St. 1873, provides: "Any precinct in any or-

ganized county of this state, shall have the privilege of voting to aid works of internal improvement, and be entitled to all the privileges conferred upon counties and cities by the provisions of this act." This only means what it says. It does not mean that any power is conferred upon the precinct as a political body. The act in question contemplates that the board of county commissioners of the county will issue the bonds if the vote justifies such issue. It does not mean that the board may change the boundaries so that a majority may be obtained in favor of their issue. In *Morton v. Carlin,* 51 Neb. 202, the board of county commissioners of Otoe county changed the precinct boundary of Nebraska City and put into the precinct a large number of sections with a view to accomplishing certain results. It was held that counties and county boards can exercise only such powers as are expressly conferred upon them by statute, and that such grant of powers must be strictly construed. *State v. Lincoln County,* 18 Neb. 283. It was further held that the change of the precinct boundaries of Nebraska City was without jurisdiction and void, and that the bonds issued were without authority of law, and there was an injunction restraining the levy of taxes. This court is as much bound now as it was then to see that such a thing as this is not done. County commissioners can legally transact county business at a regular session of the county board, or when specially called by the county clerk, of which special meeting notice is given in the mode provided by law. *Morris v. Merrell,* 44 Neb. 423. The object of calling the commissioners together should be stated in the notice. *Commissioners v. Kent,* 5 Neb. 227.

(e) It does not appear what the corporation, which is organized with a capital of $250, is going to do, except that it seems willing to receive $12,800 in bonds from Riverside precinct. It does not appear from the election proclamation that this corporation is going to have a toll bridge, or that it is going to donate the bridge to the public. The only question submitted is: "For

bridge bonds and tax." "Against bridge bonds and tax." It is true that the bridge company agreed to give a bond "to apply the proceeds thereof to the construction of the said bridge," but that determines nothing as to whether the bridge is to be a toll bridge or a free bridge. The petition for the election is equally silent. By the articles of incorporation the business to be transacted shall be the construction and operation of a wagon bridge across the Platte river at a point between sections 5 and 8, in township 10 north, of range 24 west of the sixth P. M. The bridge company is authorized to collect tolls, "if necessary," and may sell and convey the bridge after it is constructed. The sum of money proposed to become a lien against the taxable property of the precinct should be carefully guarded. For anything that appears in the proceedings there is nothing to prevent the bridge company from selling out to an irresponsible party who might allow the bridge to run down and become a wreck,

(f)    The condition put in the bonds is, "shall said bonds be delivered to the said bridge company on its giving bond, to be approved by the board of county commissioners, to apply the proceeds thereof to the construction of said bridge." It will be seen that there is no condition in the bonds further than "to apply the proceeds thereof to the construction of said bridge." There is nothing about turning the bridge over to the public, or about maintaining it for the use of the public. Neither is there anything about maintaining the bridge as a toll bridge or as a free bridge.

(g)    I am not able to say that there is no public road leading to or from said proposed bridge. There is no road across the stream. The bed of the stream belongs to private parties.

An examination of the cases of *George v. Cleveland*, 53 Neb. 716, and *Nash v. Baker*, 37 Neb. 713, will show that this court, in the protection of the taxpayer, has stood upon the letter of the law. The corporation was organized as a private corporation. Apparently it was organized for the benefit of the stockholders. In the cases

last above cited it will be seen that this court has insisted that the purpose should be one authorized by law, and, otherwise, that the bonds will be enjoined.

(h) Whether the precinct was ever organized may well be doubted. One of the petitioners, Mr. Costin, was a member of the board of county commissioners. Did he have a right to sit in judgment on his own case? The testimony shows "he was active in getting up this Riverside precinct." He seems to have made a speech, in which he said "he had looked into the matter further than anybody else; he told us his proposition for getting the bridge; he said the bond proposition was the only one that would succeed; * * * the first thing he said we would have to have a majority of the voters in the proposed territory to sign a petition to have the district set off; then to have a petition with 50 freeholders calling for a bond election, and if the election carried for the bonds we would go ahead and build the bridge and then turn the bridge over to the county, and, after the county had accepted the bridge, the territory would be returned to the original precinct." When he was asked why the six sections on the east had not been taken as well as on the west, as they were as close to the proposed bridge as the rest, he said: "We were laying off a precinct to carry for bonds." This is not denied; the other witnesses corroborate it. Jerry Costin testified: "I presume the object was to form a precinct there to build a bridge, that was as far as I know."

In *Nash v. Baker, supra,* the trial court made a finding that the representations of the promoters could have deceived no one in view of the actual facts, but this court held that there was deception nevertheless, and enjoined the bonds. In that case bonds were to be issued for the construction of a railroad from Kearney to Callaway. The promoters represented that the road to be constructed would be an independent line of railway, and that there was a president and other officers who lived at Kearney. The trial court took the view that the proposed railroad could not be an independent road, and that everybody

must take notice of that fact because it was in the center of the continent, 700 miles from a waterway, and with no power of exit except over the Burlington or Union Pacific, and that it could do nothing except by a traffic arrangement, and that these facts must be apparent to everybody, and therefore that there was no deception. In *George v. Cleveland, supra,* this court was equally zealous in protecting the taxpayer, and enjoined the bonds.

While everything that was done may have been done in the utmost good faith, the protection which the statute seems to require has been denied to the taxpayers of the precinct. I concur with the majority opinion to the extent that the bonds ought not to be issued.